UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| REX GARD,<br><br>                    Plaintiff,<br><br>        vs.<br><br>DENNIS KAEMINGK, SECRETARY OF CORRECTIONS FOR STATE OF SOUTH DAKOTA, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; DOUG WEBER, DIRECTOR OF PRISON OPERATIONS, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; BOB DOOLEY, WARDEN AT MIKE DURFEE STATE PRISON, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; TROY PONTO, ASSOCIATE WARDEN AT SDSP, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; LELAND TJEERDSMA, MAJOR, HEAD OF SPECIAL SECURITY, MIKE DURFEE STATE PRISON, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; CLIFTON FANTROY, UNIT MANAGER AT SDSP UNIT, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; GEORGE DEGLMAN , UNIT MANAGER AT MIKE DURFEE STATE PRISON, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; SGT. LARSON, SERGEANT AT MIKE DURFEE STATE PRISON, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY; AND PROPERTY OFFICER BERTHELSON, PROPERTY OFFICER AT THE SDSP WAREHOUSE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY;<br><br>                    Defendants. | 4:13-CV-04062-LLP<br><br><br><br><br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

This matter is before the court on *pro se* plaintiff Rex Gard's complaint pursuant to 42 U.S.C. § 1983 alleging defendants violated his constitutional rights. <u>See</u> Docket No. 1, 19. Pending is a motion for partial summary judgment by Mr. Gard, Docket No. 38, and a motion for summary judgment by defendants, Docket No. 63. This case has been referred to this magistrate judge by the Honorable Lawrence L. Piersol, district judge, for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge. The following is this court's recommended disposition.

## FACTS

### A.    Plaintiff's Complaint

Plaintiff Rex Gard is a prisoner at the Mike Durfee State Prison in Springfield, South Dakota. Defendants are various prison officials employed by the State of South Dakota Department of Corrections.

Mr. Gard alleges that on the evening of December 4, 2011, Lt. Sestak accused he and his two cellmates of having received a package of contraband over the prison fence. <u>See</u> Docket No. 19 at ¶¶ 14-18. Although Mr. Gard denied that it was him, he was placed in administrative segregation. <u>Id.</u> The next day he was allowed back to his room in order to pack up his property, which he did in seven boxes. <u>Id.</u> at ¶ 19. He was then taken back to administrative segregation. <u>Id.</u> at ¶ 20. While in administrative segregation, he alleges he was not allowed access to his legal materials, the prison law library,

2

or the staff attorney.  Id. at ¶¶ 21-22.  He was not allowed any out-of-cell recreation and no outside natural light.  Id. at ¶ 23.  In addition, he alleges that while he was in administrative segregation, the toilet of the cell next to him was left unflushed for several days with urine and feces in it.  Id. at ¶ 23-(a) (found at p. 14 of the amended complaint).[1]  Also, he alleges that, prior to his segregation, he had been seen by prison dental staff who had been unable to fix his tooth because they lacked the proper bonding agent at the time.  Id. at ¶ 34-(a).  Until the tooth could be fixed, Mr. Gard alleges he was prescribed a special diet because his tooth was extremely sensitive.  Id.  While Mr. Gard was in administrative segregation, he was not allowed to see the prison dental staff for further treatment of his tooth.  Id.

On December 27, 2011, Mr. Gard alleges he was written up for "Conduct Which Disrupts," a Category 5 rule infraction.  Id. at ¶ 24.  On December 30, 2011, defendant George Degelman, "acting as the UDC," offered Mr. Gard 45 days of administrative segregation if he would plead guilty to the write-up.  Id. at ¶ 26.  Mr. Gard refused the offer, saying he wanted to take the write-up to the "DHO" and for staff representative Tammy DeJong to be his assistant.  Id.  Mr. Gard alleges that he told Mr. Degelman that he wanted to call a particular inmate as a witness.  Id.[2]

---

[1] Although Mr. Gard mentions this alleged condition in his amended complaint, he never provided factual support for it in the summary judgment briefing and never made any reference to the condition in his arguments.  The court deems this allegation to have been abandoned by Mr. Gard.

[2] "UDC" is an acronym for Unit Disciplinary Committee.  "DHO" is an acronym for Disciplinary Hearing Officer.

Mr. Gard alleges that his disciplinary hearing took place on January 3, 2012.  Id. at ¶ 29.  Defendant Sgt. Larson presided over the hearing.  Id.  He alleges that Larson would not allow Mr. Gard to call his witness on his behalf. Id.  He was found guilty of the write-up.  Id. at ¶ 32.  The penalty meted out was a fine of $99, a custody level increase, and a transfer to the South Dakota State Penitentiary in Sioux Falls, South Dakota for one year.  Id. at ¶¶ 32-33. Mr. Gard alleges that no evidence was introduced at his hearing and no record was made of any confidential information, how the information was obtained, or whether the witness was deemed credible.  Id. at ¶ 32.  When Mr. Gard was transferred, his seven boxes of property were lost or stolen, although he later received some of it back.  Id. at ¶¶ 39-42.

Mr. Gard alleges that he exhausted his administrative remedies prior to bringing this action by filing a prisoner grievance for all these issues.  Id. at ¶ 43.  After these were denied, he alleges he filed for administrative remedies which were either denied or ignored.  Id. at ¶ 44.  Mr. Gard alleges that he then sent requests for reconsideration of the prison's decision, all of which were to no avail.  Id. at ¶ 45.

Mr. Gard alleges defendants violated his due process rights under the Fifth and Fourteenth Amendment when they convicted him of a disciplinary infraction without evidence and disallowed Mr. Gard from calling any witnesses on his own behalf.  See Docket No. 19 at ¶ 47.  He also alleges the fine of $99.00 meted out as part of the sentence for this infraction violated his right to be free from excessive fines.  Id.  He alleges his due process rights were further

4

violated because defendants failed to follow established prison policies by not correcting the original due process violation when Mr. Gard filed grievances and by failing to secure Mr. Gard's property.  Id. at ¶ 48.

Mr. Gard alleges defendants denied his Eighth Amendment right to be free from cruel and unusual punishment by denying him dental care while he was in administrative segregation and by subjecting him to the smell of another inmate's urine and feces which were present in the toilet of the next cell over for a period of several days.  Id. at ¶¶ 49, 23-(a) (paragraph 23-(a) is found at p. 14 of the document).  He also alleges that defendants denied his right to counsel under the Sixth Amendment and his due process rights by not allowing him access to the staff attorney and to his legal materials and books while he was in solitary confinement.  Id. at ¶ 50.  Mr. Gard seeks declaratory and injunctive relief as well as compensatory and punitive damages and costs. Id. at ¶¶ 53-60.

**B.    Defendants' Factual Allegations Supported by Affidavits and Other Evidence**

### 1.    Pre-hearing

On November 14, 2011, a veneer fell off of Mr. Gard's tooth.  See Docket No. 64-14 at p. 1.  He kited a request to be seen by prison dental staff writing that "one of my laminates broke off.  I cannot eat hot or cold food (anything), I need to see the dentist."  See Docket No. 64-7 at p.3. Mr. Gard was seen by a dentist the next day.  See Docket No. 64-14 at p.1.  When the veneer broke off, it had some composite still attached, preventing the treating dentist from re-

adhering the veneer at that visit.  Id.  Instead, the dentist contacted the laboratory and asked for a solution to the problem.  Id.

The attachment of a veneer to a tooth is considered to be a cosmetic procedure.  See Docket No. 64-1.  Although Mr. Gard complained of his tooth being sensitive, he never told dental staff that he was in pain.  Id.  Following his November 15 dentist appointment, Mr. Gard was not prescribed any special treatment because of the missing veneer.  Id.

On December 4, 2011, shortly before 6:00 a.m. prison officials saw on security cameras an individual outside the prison toss contraband over the security fence at the Mike Durfee State Prison.  See Docket No. 75-1 at p. 4. Inmate #1,[3] whom prison officials identified from the security camera, then picked up the contraband and passed it through a window into Room 113, which Mr. Gard shared at the time with two other inmates.  Id.  Prison official Lee Kaufenberg then questioned Inmate #1 about the contraband.  Id.

Inmate #1 declined to identify to whom he had passed the contraband in Room 113, so Kaufenberg then took Inmate #1 to the Special Housing Unit ("SHU"), for administrative segregation from other inmates.  Id.  Inmate #2,[4] who was already in the SHU for picking up a drop of contraband tobacco on an

---

[3] Defendants do not call this individual "Inmate #1."  Instead, his name is redacted from defendants' exhibit.  See Docket No. 75-1.  The court dubs him "Inmate #1" for ease of discussion.

[4] Again, defendants do not identify this individual as "Inmate #2," but merely redact his name from their exhibit.  See Docket No. 75-1.  The court uses this label for ease of reference.

earlier date, asked Inmate #1 why he was being brought to the SHU.  Id. Inmate #1 replied "The same thing you did."  Id.

After depositing Inmate #1 in the SHU, Kaufenberg then went to Room 113 to question the three inmates who shared that cell.  Id.  Mr. Gard identified his two roommates as Eric Woods and Matt Kurtenbach.  See Docket No. 19 at ¶ 15.  All three, including Mr. Gard, denied any involvement in the contraband drop, so Kaufenberg placed all three inmates, Gard included, in the SHU.  See Docket No. 75-1 at p. 4.

While Mr. Gard was in the SHU, he requested legal materials from the law library and the prison staff delivered those to him.  See Docket No. 64-2. Similarly, he requested his legal papers from his cell and he was allowed to remove the legal papers he needed and take them with him to the SHU.  Id. While Mr. Gard was in the SHU, he was on the waiting list to meet with the contract attorney.  Id.

As to the importation of contraband issue, review of security camera footage showed one of Gard's roommates making a couple of trips down the hallway, maybe to the bathroom, prior to Kaufenberg's arrival at the room.  See Docket No. 75-1 at p. 4.  After removing the three occupants of Room 113, officers searched the room.  Id.  In one of Gard's roommate's lockers, officers found some contraband chewing tobacco in a baggie.  Id.

Defendant Major Leland Tjeerdsma investigated this matter.  See Docket No. 64-4.  A confidential source informed Maj. Tjeerdsma on December 23, 2011, that Mr. Gard was the one who arranged for the contraband to be

delivered and who hired Inmate #1 to pick the contraband up and deliver it to Room 113.  See Docket Nos. 64-4, and 64-9 at p. 2.  Mr. Gard was present in Room 113 at the time Inmate #1 handed in the contraband through the window.  See Docket No. 64-9 at p. 2.  The confidential source told Maj. Tjeerdsma that the contraband was tobacco.  Id.  This information from the confidential source was confirmed by the evidence on the security cameras as well as by the search of Room 113 which turned up contraband tobacco. See Docket No. 64-9 at p. 2; 75-1 at pp. 4-5.

On December 26, 2011, Mr. Gard kited regarding his tooth, writing "I was wondering about my tooth??? (laminate)."  See Docket No. 64-7 at p.3. Prison dental staff noted the kite and indicated that an appointment would be set up for Mr. Gard when he was released from the SHU.  See Docket No. 64-14 at p. 2.

On December 27, 2011, based on his investigation, Maj. Tjeerdsma charged Mr. Gard with conflict which disrupts or interferes with the security or good order of the institution or interfering with a staff member in the performance of his/her duties.  See Docket Nos. 64-4 and 64-9.  This is a Category 5 Prohibited Act, which is the most serious category of offenses an inmate can commit.  See Docket No. 64-4.  Lt. Cline delivered the Disciplinary Report authored by Tjeerdsma to Mr. Gard the same date.  See Docket No. 64-9.  Mr. Gard stated "I don't have anything to do with this."  Id.

On December 27, 2011, Mr. Gard submitted a dental kite, writing "I may be going to Sioux Falls.  Can I please get my laminate put back on.  Thanks." See docket No. 64-7 at p. 2.

### 2.    The Administrative Process and Hearing

Defendant Deglman met with Mr. Gard on December 30, 2011, in the capacity of the Unit Disciplinary Committee.  See Docket No. 64-2.  At the meeting, Mr. Gard told Deglman that he wished to have a disciplinary hearing. Id.  Deglman gave Mr. Gard a form to complete to indicate if he wished to call any witnesses at the hearing.  Id.  Mr. Gard left the form blank, not writing in the names of any witnesses.  Id.  Deglman does not specifically recall this conversation with Mr. Gard, but has testified under oath that if Mr. Gard wished to call a witness, the name of the witness would have been listed on the form.  Id.  See also Docket No. 64-8.  If an inmate does not list any witnesses on the form, but later changes his mind and decides that there is, in fact, a witness he wants to call at the hearing, he must kite the Disciplinary Hearing Officer requesting that the witness be produced at the hearing.  See Docket No. 64-2, Docket No. 64-3, and Docket No. 64-6.

The reason inmates are required to list their proposed witnesses in advance of the hearing, either on the form or by filing a kite, is that other inmates are not required to testify as witnesses for other inmates.  See Docket No. 64-3.  Therefore, if an inmate lists another inmate as a prospective witness, prison staff contacts that witness before the hearing date to give that inmate-witness the opportunity to decline to testify.  Id.  Additionally, whenever

inmates are moved about the prison, security concerns are presented which require advance planning by prison staff.  Id.

Sergeant Jerrame Larson acted as the Disciplinary Hearing Officer for Mr. Gard's disciplinary hearing, which was held on January 3, 2012.  See Docket No. 64-3.  Sgt. Larson testified under oath that Mr. Gard never kited him asking to call any witnesses at the hearing.  Id.  At the hearing, Mr. Gard attempted to call a witness without having told prison staff about his intent to do so in advance of the hearing.  See Docket No. 64-6.  His representative, Tammy DeJong, told Mr. Gard that he was not allowed to call witnesses at the last minute during the hearing without advance notification to prison staff of his intent to do so.  Id.  Ms. DeJong did *not* tell Mr. Gard that the reason he could not call witnesses was because his guilt was a foregone conclusion.  Id.

Sgt. Larson found at the end of the disciplinary hearing that Mr. Gard was guilty of the charged conduct.  See Docket No. 64-3.  Sgt. Larson testified under oath that he based his determination on the disciplinary write-up authored by Tjeerdsma (found at Docket No. 64-9 at p. 2); the informational reports, including reports from Special Security (found at Docket No. 75-1), and Mr. Gard's testimony.  See Docket No. 64-3.

The Disciplinary Report, authored by Maj. Tjeerdsma, contains a finding that the confidential information relayed to him by an informant was reliable and states the information was supported by the security camera footage.  See Docket No. 64-9.  Sgt. Larson relied, in part, on this report in making his findings of guilt.  See Docket No. 64-3.  The Disciplinary Report was shared

10

with Mr. Gard.  See Docket No. 64-9 (signature of Lt. Cline attesting he delivered a copy of the Disciplinary Report to Gard on December 27).  The documents found at Docket No. 75-1 (informational reports and Office of Special Security Report) were not shared with Mr. Gard at the time of the hearing due to security concerns and the naming of various confidential sources of information.  See Docket No. 64-4.

Based on the finding of guilt, Sgt. Larson sentenced Mr. Gard to 90 days of disciplinary segregation (of which he had already served 30 days pre-hearing and for which he was given credit) and a fine of $99.  See Docket No. 64-9. Sgt. Larson testified that he has "often" given fines of between $90 and $99 for offenses as egregious as Mr. Gard's.  See Docket No. 64-3.

After Mr. Gard received a response to his earlier dental kite telling him that because his dental work was considered cosmetic, it would not be scheduled until his release from the SHU, he filed an informal resolution request and a request for an administrative remedy, protesting the decision. See Docket No. 64-7 at pp. 5-6.  The prison policy is that necessary medical care, including dental care, will be provided to inmates in the SHU; the prison's decision not to schedule a dental appointment for Mr. Gard while he was in the SHU was because the attachment of the veneer was not considered immediately necessary dental care.  See Docket No. 64-1.  On January 5, 2012, Mr. Gard submitted a dental kite, writing "I am going to Sioux Falls today.  Can you please send my [tooth] veneer to SDSP [Sioux Falls].  Thanks!"  See Docket No. 64-7 at p. 2.

11

### 3. Post-hearing

After the hearing, Mr. Gard was transferred to the South Dakota State Penitentiary in Sioux Falls.  See Docket No. 64-5.  Mr. Gard's personal belongings from Springfield were sent to the Sioux Falls prison and searched upon their arrival by defendant Property Officer Robert Berthelson.  Id.  Some items that are permissible for inmates to possess at the Mike Durfree State Prison in Springfield are prohibited at the Sioux Falls facility.  Id.  Berthelson made a complete inventory of all of Mr. Gard's items which were prohibited at Sioux Falls.  Id.  See also Docket No. 64-11.  These items were placed in two boxes and given to defendant Associate Warden Troy Ponto.  Id.

After being notified that the prison was confiscating certain property that was not allowed at the Sioux Falls facility, Mr. Gard filed a grievance with Ponto.  See Docket No. 65 at p. 6.  One box was returned to Mr. Gard by Ponto and forwarded on to the Mike Durfee State Prison.  See Docket No. 64-11.  Miscellaneous craft items belonging to Mr. Gard were placed in a craft locker for him.  Id.

On January 10, 2012, Mr. Gard submitted a dental kite, writing "My veneer on [tooth] #9 came off at Springfield.  They are sending it here.  I need to have it put back on as soon as possible; it is very sensitive to temp.  Thanks!"  See Docket No. 64-7 at p. 1.  The Sioux Falls prison dental staff contacted Springfield the same day Mr. Gard submitted his kite and requested Springfield to send Mr. Gard's veneer.  See Docket No. 64-14 at p. 2.  The veneer arrived

on January 12 and was reattached to Mr. Gard's tooth the same day.  See

Docket No. 64-1 and Docket No. 64-14 at p. 2.

**C.     The Parties' Summary Judgment Motions**

Mr. Gard moved for partial summary judgment on the issue of liability of

defendants for some of his claims.  See Docket No. 38.  Thereafter, the district

court stayed discovery pending a motion by defendants for summary judgment

on the issue of qualified immunity.  See Docket No. 60.  Defendants have now

filed their motion for summary judgment based on qualified immunity and it is

ripe for decision.  See Docket No. 63.

## DISCUSSION

**A.     Summary Judgment Standard**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary

judgment is appropriate where the moving party "shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  FED. R. CIV. P. 56(a).

The court must view the facts, and inferences from those facts, in the

light most favorable to the nonmoving party.  See Matsushita Elec. Co. v.

Zenith Radio Corp., 475 U.S. 574, 587–88 (1986) (citing United States v.

Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v. Southland Racing Corp.,

600 F.3d 954, 957 (8th Cir. 2010) (per curiam).  Summary judgment will not lie

if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir. 1994).

13

The burden is placed on the moving party to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at 256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. (citing 10A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FED. PRACTICE & PROCEDURE § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:  "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only

14

by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.

**B.    Official Capacity Claims**

Mr. Gard sues all defendants in both their official capacities and their individual capacities.  See Docket No. 19 at ¶ 13.  The state of South Dakota has immunity from suit in this federal forum under the Eleventh Amendment to the United States Constitution.  Kentucky v. Graham, 473 U.S. 159, 170 (1985).  Defendants argue that suing them in their official capacity is the same as suing the state itself.  See Docket No. 64.

In Will v. Michigan Dept. of State Police, 491 U.S. 58, 60-61 (1989), a plaintiff brought a § 1983 claim against various state officials in their official capacity.  Section 1983 provides a cause of action for deprivations of constitutional rights done by a "*person*" acting under color of state law.  Id. at 60, 60 n.1 (citing 42 U.S.C. § 1983).  The Court held that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."  Id. at 71 (citing Brandon v. Holt, 469 U.S. 464, 471 (1985)).  "As such," the Court continued, "it is no different from a suit against the State itself."  Id. (citing Graham, 473 U.S. at 165-55; Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 690, n.55 (1978)).  The Will Court held, therefore, that "neither a State nor its officials acting in their official capacities are 'persons' [amenable to suit] under § 1983."  Id.

The Will analysis and holding apply squarely to Mr. Gard's official capacity claims.  All named defendants are employees of the state of South

15

Dakota.  As such, a suit against any of them in their official capacities is tantamount to a suit against the state of South Dakota itself.  Such claims are not recognized under 42 U.S.C. § 1983.  Accordingly, summary judgment should be granted to defendants on Mr. Gard's official capacity claims.[5]

Mr. Gard argues that claims for injunctive relief against state actors sued in their official capacities are not barred by Eleventh Amendment immunity and he has requested injunctive relief in his complaint.  See Docket No. 82 (citing Leatherman v. Tarrant County, 507 U.S. 163 (1993)).  The Leatherman opinion dealt with whether a heightened pleading standard should apply when § 1983 plaintiffs sued a local governmental entity asserting liability pursuant to Monnell v. New York City Dept. of Soc. Servs., 436 U.S. 658 (1978).  Leatherman, 507 U.S. at 163-65.  The Leatherman opinion does not stand for the proposition Mr. Gard asserts it does.  Furthermore, as discussed more fully below, Mr. Gard has failed to establish any violation of his constitutional rights.  As such, even if injunctive liability against defendants in their official

---

[5] Previously, Mr. Gard asked this court to stay a ruling on defendants' summary judgment motion because issues in addition to the issue of qualified immunity were raised in defendants' motion.  (The district court had stayed discovery pending the filing of a motion from defendants based on qualified immunity).  It is true that defendants' argument for summary judgment on the official capacity claims is not within the scope of its qualified immunity arguments.  Nevertheless, the law in this area is "black letter law," and no amount of discovery would change the outcome of the court's ruling on the official capacity claims.  Therefore, the court continues to believe the district court was correct in staying discovery.

capacities were theoretically possible, such relief would not be afforded here because the claims of constitutional violation fail on their merits.[6]

## C.     Individual Capacity Claims

### 1.     The Law of Qualified Immunity

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Gard must show (1) defendants acted under color or state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected federal right.' " Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is immunity from suit, not just a defense to liability at trial. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

To determine whether an official may partake of qualified immunity, two factors must be determined: (1) whether the facts that plaintiff has shown make out a violation of a constitutional right and (2) whether that constitutional right was "clearly established" at the time of the official's acts. Saucier v. Katz, 533 U.S. 194, 201 (2001). If the court finds that one of the two elements is not met, the court need not decide the other element, and the court may address the elements in any order it wishes "in light of the circumstances

---

[6] The same analysis applies to any potential respondeat superior liability.

17

of the particular case at hand." <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009). Defendants are entitled to qualified immunity if the answer to either of the <u>Saucier</u> prongs is "no."

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " <u>Stanton v. Sims</u>, ___ U.S. ___, 134 S. Ct. 3, 5 (2013) (quoting <u>Ashcroft v. al-Kidd</u>, ___ U.S. ___, 131 S. Ct. 2074, 2085 (2011) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986))). " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " <u>Stanton</u>, 134 S. Ct. at 5.

## 2. Delay of Dental Care—Deliberate Indifference

The district court, upon screening Mr. Gard's complaint, fully set forth the legal standards applicable to his claim of deliberate indifference as follows. "[D]eliberate indifference to serious medical needs of prisoners constitutes 'the unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976) (quoting <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." <u>Id.</u> at 104-05. "[T]his does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth

18

Amendment." Id. at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. Allegations of negligence are not enough to state a claim. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (prisoner must show more than gross negligence and more than disagreement with treatment decisions).

Deliberate indifference requires the court to make both an objective and a subjective evaluation. Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahja, 114 F.3d 778, 784 (8th Cir. 1997)). Mr. Gard is required to show (1) that he suffered objectively serious medical needs and (2) that defendants actually knew of but deliberately disregarded those needs. Id. (citing Coleman, 114 F.3d at 784). "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Coleman, 114 F.3d at 784. To establish liability, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). See Docket No. 7, at pages 6-7 (district court screening opinion).

Mr. Gard's claim of deliberate indifference centers around the delay by defendants in replacing a dental veneer. When a prisoner alleges that a delay in treatment violates the Eighth Amendment deliberate indifference standard, he "must place verifying medical evidence in the record to establish the

detrimental effect of the delay in medical treatment to succeed." <u>Crowley v. Hedgepeth</u>, 109 F.3d 500, 502 (8th Cir. 1997)(citation omitted).

Neither party fully explains what a dental veneer is.  The following description is found on the web site maintained by the American Academy of Cosmetic Dentistry:

> Porcelain veneers are thin pieces of porcelain used to recreate the natural look of teeth, while also providing strength and resilience comparable to natural tooth enamel.  It is often the material of choice for those looking to make slight position alterations, or to change tooth shape, size, and/or color. . . . Porcelain laminate veneers consist of a compilation of several thin ceramic layers which replace original tooth enamel, and an adhesive layer.  To apply a veneer, a very small amount of the original tooth enamel must be removed, usually less than a millimeter.  This is essential as it creates room for the porcelain veneer to fit within the mouth and most accurately restore natural tooth function while creating an even better appearance than the original tooth. . . . The bond between original tooth and porcelain veneer is critical as it not only provides the esthetic perfection desired, but also a strong bond which is essential for correct veneer function. . . . Porcelain veneers are a very successful option in many situations where the original tooth has developed poor color, shape, and contours.  It is also a good choice for fractured teeth, gaps between teeth, and in some situations where the tooth position is compromised and there are minor bite-related problems.

<u>See</u> http://www.aacd.com/veneers last checked Jan. 28, 2015.

In their motion for summary judgment, defendants argue (supported by an affidavit from the prison dentist) that the replacement of Mr. Gard's dental veneer was a cosmetic procedure and, therefore, did not qualify as a "serious medical need" under <u>Estelle</u>.  <u>See</u> Docket No. 64-1.  There is no reason to question defendants' characterization of the procedure as "cosmetic," but that begs the question.  A cosmetic procedure gone awry could nevertheless pose a life-threatening condition which, if ignored, would create liability for deliberate

indifference.  Beauty queens and movie stars have been known to develop septic shock (a life-threatening condition) from the various procedures to which they voluntarily subject themselves.[7]   Here, although defendants certainly would not be required to grant a request by an inmate to have dental veneers applied in the first instance as a cosmetic procedure, such conclusion does not resolve the question as to whether the reattachment of the veneer was a serious medical need.

Although Mr. Gard complained of his tooth being sensitive, defendants argue he never told dental staff that he was in pain.   See Docket No. 64-1. Defendants also point out that, following his November 15 dentist appointment, Mr. Gard was not prescribed any special treatment or diet because of the missing veneer.  Id.

Mr. Gard does not contradict the assertion that the veneer was cosmetic, but argues that replacement of the veneer was nevertheless as "serious medical need" because he was in serious pain without the veneer.  The record before the court does not support Mr. Gard's assertion.

Mr. Gard originally kited a request on November 14, 2011, to be seen by prison dental staff writing that "one of my laminates broke off.  I cannot eat hot or cold food (anything), I need to see the dentist."  See Docket No. 64-7 at p.3. Mr. Gard was seen by a dentist the next day.  See Docket No. 64-14 at p.1. The reason the veneer was not affixed back onto Mr. Gard's tooth immediately

[7] See http://news.yahoo.com/tv-stars-plastic-surgery-disaster-tests-brazeil-0516393332.html (last checked Jan. 29, 2015) (reporting on Brazilian tv star Andressa Urach who developed septic shock and was placed on life support after a cosmetic operation).

was because a bit of the cement adhesive was still clinging to the back of the veneer and dental staff sought assistance in determining how to reattach the veneer.   Id.  Following his November 15 dentist appointment, Mr. Gard was not prescribed any special treatment because of the missing veneer.  Id.  See also Docket No. 64-1.

On December 26, 2011, Mr. Gard kited from the SHU regarding his tooth, writing "I was wondering about my tooth??? (laminate)."  See Docket No. 64-7 at p.3.  Prison dental staff noted the kite and indicated that an appointment would be set up for Mr. Gard when he was released from the SHU.  See Docket No. 64-14 at p. 2.

After Mr. Gard received a response to his earlier dental kite telling him that because his dental work was considered cosmetic, it would not be scheduled until his release from the SHU, he filed an informal resolution request and a request for an administrative remedy, protesting the decision. See Docket No. 64-7 at pp. 5-6.  In his protest he wrote "My tooth is exposed and I have pain.  Pain is not cosmetic."  See Docket No. 64-7 at p. 5.

The prison policy is that necessary medical care, including dental care, will be provided to inmates in the SHU; defendants' decision not to schedule a dental appointment for Mr. Gard while he was in the SHU was because the attachment of the veneer was not considered immediately necessary dental care.  See Docket No. 64-1.  On January 5, 2012, Mr. Gard submitted a dental kite, writing "I am going to Sioux Falls today.  Can you please send my [tooth] veneer to SDSP [Sioux Falls].  Thanks!"  See Docket No. 64-7 at p. 2.

On January 10, 2012, Mr. Gard submitted a dental kite, writing "My veneer on [tooth] #9 came off at Springfield.  They are sending it here.  I need to have it put back on as soon as possible; it is very sensitive to temp.  Thanks!"  See Docket No. 64-7 at p. 1.  The Sioux Falls prison dental staff contacted Springfield the same day Mr. Gard submitted his kite and requested Springfield to send Mr. Gard's veneer.  See Docket No. 64-14 at p. 2.  The veneer arrived on January 12 and was reattached to Mr. Gard's tooth the same day.  See Docket No. 64-1 and Docket No. 64-14 at p. 2.

Mr. Gard submitted a total of five kites relating to the detached veneer.  In none of those did Mr. Gard ever state that he was in pain, let alone "serious" pain.  The most he ever conveyed to defendants in his kites was that his tooth from which the veneer detached was sensitive to temperature.  In his administrative appeal, he stated "I have pain," but even this statement does not convey a serious medical need.  See Docket No. 64-7 at p. 5.  This was the first time Mr. Gard told anyone at the prison that he was in pain.  The date of this written statement is January 4, 2012.  Id.  Mr. Gard had just been transferred from Springfield to Sioux Falls; his veneer was transferred from Springfield to Sioux Falls on January 12, 2012.  See Docket No. 64-14 at p. 2.  The veneer arrived on January 12 and was reattached to Mr. Gard's tooth the same day.  See Docket No. 64-1 and Docket No. 64-14 at p. 2.  Thus, even if Mr. Gard's reference to "pain" in his January 4, 2012 statement can be considered a serious medical need, prison officials acted promptly once they knew of Mr. Gard's pain to get the veneer reattached.  Finally, Mr. Gard's claim fails

23

because he never placed any verifying medical evidence into the record establishing the detrimental effect caused by defendants' delay in reattaching his dental veneer.  See Crowley, 109 F.3d at 502; Hill, 40 F.3d at 1188.

The record before the court does not establish an objectively "serious medical need" nor the subjective awareness on the part of defendants that Mr. Gard was experiencing a "serious medical need."  As such, Mr. Gard has not established his claim for deliberate indifference.  The defendants' summary judgment motion for qualified immunity on this claim should be granted as defendants were not "plainly incompetent" with regard to Mr. Gard's Eighth Amendment rights.

### 3.   Denial of Access to the Courts

Again, the district court's screening opinion of Mr. Gard's complaint in this case sets forth an accurate statement of the law as to prisoners' right of access to the courts.  Although prisoners do have a right of access to the courts, prisoners must establish an "actual injury" to that right to prevail on a § 1983 claim premised on violation of the right.  See Bounds v. Smith, 430 U.S. 817, 821 (1977); Moore v. Plaster, 266 F.3d 928, 933 (8th Cir. 2001) (citing Klinger v. Dept. of Corrections, 107 F.3d 609, 617 (8th Cir. 1997)).  "Actual injury" means "that a nonfrivolous legal claim had been frustrated or was being impeded."  Moore, 266 F.3d at 933 (quoting Johnson v. Missouri, 142 F.3d 1087, 1089 (8th Cir. 1998)).  See Docket No. 7 at p. 8 (district court's screening opinion).

24

Mr. Gard alleges that while he was in the SHU, he was prevented from accessing legal materials and legal assistance.  Because of this deprivation, he alleges that an appeal he had pending before the federal district court was dismissed.  Defendants assert that once Mr. Gard requested his legal papers from his room, those papers were brought to him in the SHU.  Further, defendants state that Mr. Gard was on the waiting list to see the staff attorney.  The court need not resolve these conflicting factual assertions because it is clear that there was never any actual injury to Mr. Gard.

The federal district court case referenced by Mr. Gard was his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  See Gard v. Weber, Civ. No. 10-5017.  Mr. Gard initiated that matter by filing a petition with this court on March 25, 2010.  See id. at Docket No. 1.  On May 19, 2010, the respondents filed a response to Mr. Gard's petition, asking the court to dismiss the petition without granting relief on the ground, *inter alia*, that Mr. Gard had procedurally defaulted his claims in his federal petition by not first exhausting his state remedies.  See id. at Docket Nos. 9, 10.  Mr. Gard responded to the respondents' motion to dismiss on October 8, 2010.  See id. at Docket No. 23.[8]

Six months later, the district court had still not taken any action on respondents' pending motion to dismiss.  On March 10, 2011, Mr. Gard filed a motion seeking to have his federal habeas matter stayed and to remand the matter back to state court so that he could finish exhausting his state claims.  See id. at Docket Nos. 24, 25, 29.  On July 11, 2011, Mr. Gard also moved for

---

[8] Mr. Gard filed his response on October 8, 2010, after requesting and receiving extensions of time from the district court.

an order compelling the prison to give Mr. Gard "an unlimited number of copies of case law, or a research based software." See id. at Docket No. 28. Respondents filed a memorandum in opposition to Mr. Gard's motion to stay on July 20, 2011. See id. at Docket No. 31. On October 31, 2011, Mr. Gard then filed a motion asking the court to appoint counsel to represent him. See id. at Docket No. 33.

The case again sat dormant for another six months until the district court issued an order on March 3, 2012, dismissing Mr. Gard's habeas petition and declining to issue a certificate of appealability. See id. at Docket No. 36. The district court dismissed one claim as being unexhausted. Id. at p. 18. The remaining claims were dismissed on their merits as having no basis in law. Id. at pp. 18-28. The district court denied Mr. Gard's request for a stay and abeyance, finding that the facts and the circumstances in his case did not warrant the use of that procedure. Id. at pp. 28-29. Finally, the court denied Mr. Gard's request for counsel and for unlimited research copies or software. Id. at pp. 29-30.

Mr. Gard was first placed in the SHU on December 4, 2011. At the end of December he was sentenced to 90 days of administrative segregation for importing contraband into the Springfield prison. He was given credit for the time he had already spent in the SHU beginning on December 4, 2011. When Mr. Gard was transferred to the penitentiary in Sioux Falls in early January, 2012, the record is unclear whether Mr. Gard continued to reside in the SHU when he arrived in Sioux Falls. Even if one assumes that Mr. Gard served the

26

remaining 60 days of administrative segregation at the Sioux Falls penitentiary, he would have been released from the SHU no later than March 4, 2012.  He may have been out of the SHU as early as January 4, 2012.

During this entire time period from December 4, 2011, until March 4, 2012, Mr. Gard's federal habeas matter was fully briefed by the parties and lying dormant, awaiting the district court's decision.  See Gard v. Weber, Civ. 10-5017, Docket.  The district court's decision was issued one day before the latest possible end date of Mr. Gard's SHU confinement—on March 3, 2012. Id. at Docket No. 36.  The court record indicates that the March 3 decision from the district court was mailed to Mr. Gard on March 5, 2012.  Therefore, there was no activity in Mr. Gard's habeas case during his SHU confinement nor was there any activity which needed to be taken.

Mr. Gard alleges that he was in the process of working on a supplemental brief to submit to the court in his habeas matter and that defendants' actions prevented him from doing so.  Mr. Gard never explains what issues, factual or legal, he planned to present in this supplemental brief. Reading the district court's opinion, it is difficult to see any argument that Mr. Gard could have raised that would have changed the outcome of the court's decision.  In any case, Mr. Gard could have submitted the brief after the district court issued its opinion as a motion for reconsideration.  The docket in Mr. Gard's habeas matter reveals no such additional filing.  The right of access to the courts does not encompass the right to "litigate effectively once in court." Lewis v. Casey, 518 U.S. 343, 354 (1996).

27

Even if Mr. Gard's factual assertion is true that he was denied access to his legal papers and to legal assistance during his SHU confinement—a fact denied by defendants—Mr. Gard cannot prove that he suffered an "actual injury" with regard to his habeas litigation.  Nothing happened in his habeas case during his SHU confinement.  Nothing needed to be done.  Accordingly, the court recommends granting defendants' motion for summary judgment on Mr. Gard's access to the courts claim.

### 4.   Excessive Fines

Again, the district court's screening opinion provides an accurate template for the evaluation of Mr. Gard's excessive fines claim under the law. See Docket No. 7 at p. 6.  Excessive fines are prohibited under the Eighth Amendment to the United States Constitution.  "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality:  The amount of the [fine] must bear some relationship to the gravity of the offense that it is designed to punish."  Mills v. City of Grand Forks, 614 F.3d 495, 501 (8th Cir. 2010) (quoting United States v. Bajakajian, 524 U.S. 321, 334 (1998)).  Mr. Gard is required to prove "(1) gross disproportionality; and (2) that the disproportionality is of such a level that the punishment is more criminal than the crime."  Id.  See Docket No. 7 at p. 6.

The district court appears to have allowed this claim to survive screening based on Mr. Gard's allegation that he was fined $99 for an offense he did not commit.  As will be seen in Section C.5 of this opinion, discussed below, there was reasonable evidence in support of the finding that Mr. Gard was

28

responsible for illegally importing contraband into the Springfield prison.  In short, a confidential informant told prison officials that Mr. Gard was responsible, and the informant's information was corroborated by security film footage and a search of Mr. Gard's room after he and his roommates were removed.  To the extent Mr. Gard's excessive fines claim is premised on a claim that he was convicted without evidence, defendants should be granted summary judgment on that claim.  Defendants were not "plainly incompetent" in finding a factual basis upon which to fine Mr. Gard.

To the extent Mr. Gard can be understood to argue that the amount of the fine was disproportionate to his crime, the court also believes summary judgment should be granted to defendants on the excessive fines claim. Defendants established through their summary judgment motion that Mr. Gard's offense is in the class of the most serious offenses an inmate can commit.  See Docket No. 64-4 at ¶ 7.  Further, defendants established that Mr. Gard's conduct in importing contraband into the Springfield prison could have formed the basis of independent felony criminal charges against Gard. See Docket No. 64 at p. 11 (citing SDCL § 24-2-22).  If Mr. Gard had been convicted of a separate crime, he could have been fined up to $4,000.  Id. (citing SDCL § 22-6-1).  Defendants also established that prison officials are legislatively granted the power to impose fines for violations of a prison's rules. Id. (citing SDCL § 24-15A-4).  Finally, defendants established that the fine of $99 was not atypical for similar types of offenses within the South Dakota prison system.  See Docket No. 64-3 at ¶ 10.

29

Under these circumstances, where Mr. Gard could have been prosecuted for a separate crime and fined up to $4,000 for the same conduct, and where the fine of $99 within the prison disciplinary system was not atypical, Mr. Gard cannot show that his fine was "grossly disproportionate" to his conduct or that the punishment is more criminal than the crime.  <u>Bajakajian</u>, 524 U.S. at 334; <u>Mills</u>, 614 F.3d at 501.

Mr. Gard argues the fine is excessive because he makes only 25¢ per hour working at the prison and his misconduct caused no property loss or damage to defendants.  <u>See</u> Docket No. 79 at p.3.  These factors do not appear to bear upon the excessive fines analysis and Mr. Gard has not cited any law in support of this argument.  In fact, the law is to the contrary.  <u>See</u> <u>United States v. Dubose</u>, 146 F.3d 1141, 1146 (9th Cir. 1998); <u>United States v. Emerson</u>, 107 F.3d 77, 81 (1st Cir. 1997) (both holding a claim that the excessive fines provision of the Eighth Amendment was violated does not require an inquiry into the offender's ability to pay or the hardship that the fine may impose on the offender).

There is an Eighth Circuit case holding that ability of the offender to pay a *civil* fine (not a *criminal* fine as is at issue here) is relevant to the excessive fines analysis.  <u>See</u> <u>United States v. Lippert</u>, 148 F.3d 974, 978 (8th Cir. 1998).  <u>See also</u> <u>United States v. Aleff</u>, 772 F.3d 508, 512 (8th Cir. 2014) (citing <u>Lippert</u> for the proposition that civil fines which are punitive in nature must take into consideration the offender's ability to pay).  The <u>Lippert</u> case cited as support for that proposition <u>United States v. Hines</u>, 88 F.3d 661 (8th Cir. 1996).  Upon

30

reading the Hines case, this court believes the Lippert court misstated the holding in Hines.

The Hines court evaluated an excessive fines claim in a criminal sentencing.  Hines, 88 F.3d at 662-64.  The court noted that the United States Sentencing Guidelines direct sentencing courts to consider a defendant's ability to pay a fine when determining whether to impose a fine as a criminal penalty and, if so, how much.  Hines, 88 F.3d at 664.  If a sentencing court complies with this directive from the Guidelines, the Hines court held that "any constitutional ability-to-pay limitation will necessarily be met."  Id.  Thus, Hines did not hold that the Eighth Amendment requires consideration of ability to pay.  Id.  Rather, the Hines court noted that the *Guidelines* impose this requirement.  Id.  The Hines court then observed that if a sentence complies with the Guidelines, any constitutional issue will necessarily be moot.  Id.

In any case, even if ability to pay is a valid consideration in the Eighth Amendment excessive fines context, Mr. Gard has failed to show he cannot pay.  He makes the bare allegation, unsupported by affidavit or documentary evidence, that he makes a wage of 25¢ per hour.  He has put no evidence before the court of what other financial resources he may have, including the balance in his prison account.  The court takes judicial notice that Mr. Gard has filed five federal civil actions in this court in the last four years, four of which require Mr. Gard to pay a $350 filing fee, albeit he has been granted *in forma pauperis* status and is allowed to pay his filing fees in intervals over the

31

course of time.[9]  From this, the court does not presume Mr. Gard has the ability to pay his fine, but in the absence of proof to the contrary, the court also will not presume that he does *not* have the ability to pay the $99 fine.  United States v. Sato, 814 F.2d 449, 452-53 (7th Cir. 1987) (court will not address constitutional issue of ability to pay under the excessive fines clause when the record is silent as to the offender's ability to pay).

Because Mr. Gard has not shown that defendants were "plainly incompetent" in fining him $99 for importing contraband into the Springfield prison, the court recommends granting defendants motion for summary judgment as to Mr. Gard's excessive fines claim.

## 5.   Denial of Due Process in the Disciplinary Process

### a.   Evolution of the Law of Due Process in Prison Cases

#### i.   Wolff v. McDonald and Its Progeny

The procedural due process clause of the Fourteenth Amendment provides that some form of notice and an opportunity to be heard must be afforded before the state may deprive a citizen of life, liberty or property. Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 12 (1979).  What procedures the due process clause requires are "flexible and variable dependent upon the particular situation being examined."  Hewitt v. Helms, 459 U.S. 460, 472 (1983).

---

[9] Cases Mr. Gard has initiated in federal court aside from his habeas case are: this case; Gard v. Dooley, Civ. 14-4023; Gard v. Dooley, Civ. 14-4179; and Gard v. Dooley, Civ. 14-4183.

In <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556 (1974), the Supreme Court held that prisoners had a right to due process of law before prison officials may deprive them of liberty, though the full panoply of due process rights enjoyed by defendants in a criminal prosecution does not apply.  Instead, "the minimum requirements of procedural due process appropriate for the circumstances must be observed."  <u>Id.</u> at 558.

In the <u>Wolf</u> case, disciplinary proceedings had deprived the plaintiffs of good-time credits.  <u>Id.</u> at 554.  The amount of process required before a deprivation can be effected depends on the importance of the liberty interest at stake.  <u>Id.</u> at 560.  The Court noted that deprivation of good-time credits was different from the deprivation of liberty suffered by a parolee or probationer. <u>Id.</u>  For the latter, the liberty interest means the difference between freedom or being confined in prison.  <u>Id.</u> at 560-61.  For prisoners deprived of good-time, the difference is not as stark:  the deprivation may or may not postpone the prisoner's parole-eligibility date, it may or may not extend the maximum term of incarceration served, and good time may be restored.  <u>Id.</u> at 561.  As such, the Court held that revocation of good time was "qualitatively and quantitatively different from the revocation of parole or probation."  <u>Id.</u>

Also, the Court noted that prison disciplinary proceedings take place in the context of "a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so."  <u>Id.</u>  In such a context, fellow inmates may have legitimate and valid reasons for not wanting an accused inmate to know that

33

they informed on them, and prison officials may similarly have a legitimate interest (related to maintaining control and peace in the prison population) in not revealing the identities of informing inmates.  Id. at 562.  In particular, the Court noted the very real possibility of retaliation and the likelihood that tensions would escalate if the full panoply of rights guaranteed in an adversary system were adopted in the prison disciplinary context.  Id. at 563.

The Court held that two requirements must apply in the prison disciplinary proceeding:  (1) the prisoner must be given written notice of the claimed violation at least 24 hours in advance of the hearing "to enable him to marshal the facts and prepare a defense" and (2) the factfinder must give a written statement of the evidence relied upon and the reasons for the disciplinary action taken, so as to ensure any collateral consequences of the action are not based on a misunderstanding of the decision and to keep the decision-makers "honest" because they know that their decision will be subject to later scrutiny.  Id. at 563-65.  The Court anticipated that the written statement of evidence relied upon "may properly exclude certain items of evidence, but in that event the statement should indicate the fact of the omission."  Id. at 565.

The Wolff Court recognized a third right:  (3) the right on the part of the accused inmate to "call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals."  Id. at 566.  The Court noted that

34

prison officials retain the necessary discretion to refuse to allow a prisoner an unqualified right to call any and all witnesses.  Id. at 566-67.

The accused prisoner does not have an unfettered right to confront and cross-examine his accusers.  Id. at 567.  Such a right, in the prison environment, would create "considerable potential for havoc inside the prison walls."  Id.  As such, the Court held that "it does not appear that confrontation and cross-examination are generally required in this context."  Id. at 568. Instead, whether to allow those rights in a prison disciplinary proceeding was left "to the sound discretion of the officials of state prisons."  Id. at 569. Accused inmates have no right to the assistance of counsel; however, where the inmate is illiterate or the matter particularly complex, the inmate should be free to seek the aid of a fellow prisoner or a prison staff person.  Id. at 570.

In conclusion, the Court emphasized that its holding applied only to those prison disciplinary proceedings where good time may be deprived and that the nature of the process may change with different circumstances.  Id. at 571-72.

The Wolff Court examined the Nebraska state statutes and penal regulations minutely.  See Wolff, 418 U.S. at 545, 545 n.5, 546, 546 n.6, 548, and 548 n.8.  In doing so, the Court was not determining what process was "due process" for purposes of its constitutional analysis; rather, the court was examining the state's law to determine the nature of the liberty interest involved.  Id.  Because state law gave inmates mandatory sentence reductions for good behavior, which credits were revocable only for "flagrant or serious

misconduct," the Court held that a due process liberty interest was created by the state laws.  Id. at 557.  The Court did **not** hold that the due process clause itself created a liberty interest in good-time credit.  Id.

The Court addressed the issue of intrastate transfers between prison facilities as a form of punishment in Meachum v. Fano, 427 U.S. 215 (1976).  In that case, prisoners had been transferred from a medium security prison to a maximum security prison after allegations of arson had been leveled at them.  Id. at 222.  No loss of good time credits or any type of disciplinary confinement was meted out as punishment—only the transfers.  Id.  As the Wolff Court had done, the Meachum Court held that the due process clause itself did not create a liberty interest in the absence of transfers, so the Court examined state law to determine if state law created a liberty interest.  Id. at 225, 228.  The Court held that the prisoners had no protected liberty interest because state law did not limit the discretion of prison officials to order prisoner transfers to alternative facilities.  Id. at 228.

Later cases further refined Wolff and Meachum by holding that, in certain circumstances, the due process clause **did**, itself, create liberty interests.  For example, a prisoner has a liberty interest in avoiding a transfer from a prison to a state mental hospital for treatment of a mental disease or defect.  Vitek v. Jones, 445 U.S. 480, 493-94 (1980).  In addition, prisoners have a liberty interest rooted in the due process clause in avoiding the involuntary administration of psychotropic drugs.  Washington v. Harper, 494 U.S. 210, 221-22 (1990).  These two situations were "qualitatively different"

36

than the circumstances in Wolff and Meachum because the punishment was different in kind from that typically meted out as punishment for a crime and because these measures had "stigmatizing consequences."  Vitek, 445 U.S. at 493-94.

In Hewitt v. Helms, 459 U.S. 460, 468, 473 (1983), following a riot in the prison, a prisoner was subjected to administrative segregation while prison officials investigated the prisoner's role in the riot.  The Court held that the due process clause did not create a liberty interest in prisoners to remain free from administrative segregation.  Id. at 468.  Examining state statutes, however, the court found "language of an unmistakably mandatory character," and held that the state law had created a liberty interest in remaining in the general prison population.  Id. at 471-72.  The Hewitt Court went on to hold that the "full panoply" of procedures outlined in Wolff as "due process" were unnecessary to safeguard the inmates' liberty interest where the punishment being meted out consisted of administrative segregation.  Id.  This liberty interest, the Court stated, is a liberty interest that is "not one of great consequence."  Id. at 473.

Further, the Court held that imposition of the Wolff procedures in this context would undermine the management objectives of the prison.  Id. Instead, where administrative segregation is imposed, prison officials need "engage only in an informal, nonadversary review of the information supporting respondent's administrative confinement, including whatever statement [the prisoner] wished to submit, within a reasonable time after confining him to administrative segregation."  Id. at 472.  Prison disciplinary proceedings

37

comply with due process if there is "some evidence" in support of the disciplinary decision.  See Superintendent v. Hill, 472 U.S. 445, 455 (1985).

### ii.    **Sandin v. Conner and the New Analysis**

The approach outlined in Wolff and its progeny resulted in the courts becoming embroiled in interpreting "the language of intricate, often rather routine prison guidelines to determine whether mandatory language and substantive predicates created" an enforceable liberty interest.  Sandin v. Conner, 515 U.S. 472, 480-81 (1995).  By focusing on the language of prison regulations instead of focusing on the nature of the deprivation at issue, "the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." Id. at 481.  This, the Court held, produced two lamentable results:  (1) it provided a disincentive for states to codify prison management, which lead to a lack of uniformity; and (2) it involved federal courts in the day-to-day management of prisons, "squandering judicial resources with little offsetting benefit to anyone."  Id. at 482.

Therefore, the Court signaled a new analysis twenty-one years after Wolff, when the Court again addressed due process in prison disciplinary proceedings in Sandin v. Conner, supra.  The Court held that it was time to "return to the due process principles" discussed and applied in Wolff and Meachum.  Id. at 483.  States may still create liberty interests which are afforded due process protection.  Id. at 483-84.  But, after Sandin, those interests are "generally limited to freedom from restraint which, while not

38

exceeding the sentence in such an unexpected manner as to give rise to

protection by the Due Process Clause of its own force, . . . nonetheless imposes

atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life." Id.   Therefore, to succeed on a procedural due

process claim arising out of prison discipline, a prisoner must either show

(1) that he has a liberty interest protected by the due process clause itself, like

the prisoners subjected to a state mental hospital or forced psychotropic

medication in Vitek and Harper, **or** (2) if the liberty interest is a creature of

state regulation only, then the prisoner must show that the prison action

"imposes atypical and significant hardship on the inmate in relation to the

ordinary incidents of prison life."  Sandin, 515 U.S. at 484.

The Sandin Court distinguished the circumstances of a prisoner from

that of a pretrial detainee or a schoolchild:

> The punishment of incarcerated prisoners, on the other hand,
> serves different aims than those found invalid in Bell [v. Wolfish,
> 441 U.S. 520 (1979) involving  pretrial detainees] or Ingraham [v.
> Wright, 430 U.S. 651 (1977) involving schoolchildren].  The process
> does not impose retribution in lieu of a valid conviction, nor does it
> maintain physical control over free citizens forced by law to subject
> themselves to state control over the educational mission.  It
> effectuates prison management and prisoner rehabilitative goals.
> Admittedly, prisoners do not shed all constitutional rights at the
> prison gate, but "[l]awful incarceration brings about the necessary
> withdrawal or limitation of many privileges and rights, a retraction
> justified by the considerations underlying our penal system."
> Discipline by prison officials in response to a wide range of
> misconduct falls within the expected perimeters of the sentence
> imposed by a court of law.

Id. at 485 (internal citations omitted).

The facts presented in <u>Sandin</u> were that Conner was subjected to a strip search by prison officials and he retorted with angry and foul language directed at the officer.  <u>Sandin</u>, 515 U.S. at 475.  He later received notice of being charged with disciplinary infractions.  <u>Id.</u>  He appeared before an adjustment committee and requested to present witnesses at the hearing, which request was denied.  <u>Id.</u>  The committee found Conner guilty of the conduct and sentenced him to 30 days of disciplinary segregation in the SHU.  <u>Id.</u> at 475-76.

Conner relied upon dicta in <u>Wolff</u> to argue that disciplinary segregation or solitary confinement automatically triggers due process protection.  <u>Sandin</u>, 515 U.S. at 485.  The Court overruled that suggestion from <u>Wolff</u> and held that "Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."  <u>Id.</u> at 486.  In support of its holding, the Court noted that Conner's disciplinary segregation mirrored conditions the state imposed on inmates in protective custody or in administrative segregation.  <u>Id.</u>  Further, Conner's confinement did not exceed in duration or degree of restriction the types of totally discretionary confinement the prison was free to impose on inmates for reasons other than discipline.  <u>Id.</u>

In addition, the misconduct was not sure to affect Conner's chances for parole.  <u>Id.</u> at 487.  Although the parole board was required to consider Conner's disciplinary record when determining whether to grant him parole, his misconduct did not require the parole board to deny parole, nor would the

40

absence of any misconduct have guaranteed Conner would receive parole.  <u>Id.</u> at 487.  Instead, the parole board was required to base its decision on a "myriad of considerations."  <u>Id.</u>  Finally, Conner was afforded procedural protection in any future parole hearings because the state rules allowed him to explain the circumstances of the discipline that appeared in his record.  <u>Id.</u> The Court held that, under the framework of the state rules, the chance that the finding of misconduct would tip the balance of future proceedings before the parole board was "simply too attenuated to invoke the procedural guarantees of the Due Process Clause."  <u>Id.</u>  Because neither the due process clause itself nor the state prison regulations gave Conner a protected liberty interest, the Court denied his procedural due process claim.  <u>Id.</u>

In reading post-<u>Wolff</u>, pre-<u>Sandin</u> case law, the reader must be discerning:  not every case in that interim period is still good law, but not every case is necessarily overruled.  If the case deals with a liberty interest that is protected by the due process clause itself, then the <u>Wolff</u> analysis continues to apply and the case remains good law.  This is true of the <u>Vitek</u> and <u>Harper</u> cases and their progeny.  If, however, the case deals with a liberty interest that was created only by reason of mandatory state rules or statutes, then the <u>Wolff</u> analysis no longer applies and the <u>Sandin</u> "atypical and significant hardship" analysis applies.

### b.    Application of the Law to Mr. Gard's Claim

The three main assertions Mr. Gard makes in his due process claim are that (1) defendants should have allowed him to call witnesses at the hearing on

41

his disciplinary charges; (2) he should have been told the identity of the confidential informants relied upon by the hearing decision-maker; and (3) defendants failed to provide a meaningful explanation of the finding of guilt.

Applying Sandin, Mr. Gard's confinement in administrative segregation for 90 days simply did not pose "atypical and significant hardship" on Mr. Gard.[10]  In Freitas v. Ault, 109 F.3d 1335 (8th Cir. 1997), the prisoner plaintiff complained his due process rights were violated when he was disciplined and transferred to a different facility and placed in "on-call" status. These disciplinary measures meant the prisoner was:  placed in "lock-up" (i.e. was allowed out of his cell for only one or two hours per day), allowed fewer visitors and no phone calls, not allowed to work at a prison job, restricted in his ability to keep personal items in his cell, and restricted in his ability to earn good time credits.  Frietas,  109 F.3d at 1337.  The Eighth Circuit held as a matter of law that "these conditions do not constitute any atypical and significant hardship when compared to the burdens of ordinary prison life."  Id.

In Orr v. Larkins, 610 F.3d 1032, 1033-34 (8th Cir. 2010), an inmate was placed in administrative segregation for nine months following a three "dirty" urine tests.  The court applied Sandin to determine whether Orr had a liberty interest at all.  Id.  "In order to determine whether an inmate possesses a liberty interest, we compare the conditions to which the inmate was exposed in segregation with those he or she could expect to experience as an ordinary

---

[10] Mr. Gard's transfer intrastate from the prison at Springfield to the prison at Sioux Falls did not implicate a liberty interest at all.  Meachum, 427 U.S. at 228.

incident of prison life . . . We do not consider the procedures used to confine the inmate in segregation." Id. at 1034 (quoting Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003)).  Noting that the court had "consistently held that a demotion to segregation, even without cause, is not itself an atypical and significant hardship," the court held that Orr had no liberty interest in remaining free from administrative segregation.  Id.

To the extent the disciplinary finding affects Mr. Gard's chances of parole, just as in Sandin, the affect is too attenuated to implicate due process rights.  If Mr. Gard does not receive automatic release on his initial parole date, he will be afforded a hearing as to why.  See SDCL 24-15A-39.  Also, Mr. Gard's disciplinary record is only one of a "myriad" of factors the parole board will consider, and Mr. Gard will have the opportunity to explain the circumstances surrounding the disciplinary findings at his prospective parole hearing.

See SDCL 24-15A-42.[11]  The parole board would not be required to grant

Mr. Gard parole if this disciplinary event was *not* in his record; conversely, the

board is not required to deny parole to him because it *is* in his record.  Id.

Based on Sandin, Orr, and Frietas then, the court concludes Mr. Gard had no

liberty interest protected by the due process clause.[12]

Even if one assumes that Mr. Gard did have a protectable liberty interest

and that Wolff applies, Mr. Gard still cannot defeat defendants' motion for

summary judgment.  As to Mr. Gard's ability to call witnesses, even the Wolff

decision recognized that the right to call witnesses was conditioned:  witnesses

---

[11] Section 25-15A-42 provides as follows:

> **24-15A-42.  Procedural Rules-Parole release standards**
> Pursuant to chapter 1-26, the board may promulgate procedural
> rules for the effective enforcement of this chapter and for the
> exercise of powers and duties conferred upon it.  Additionally, the
> board shall utilize the following standards in determining if the
> inmate has substantively met the requirements for parole release
> at the initial parole date:
> (1) The inmate's compliance with work, school, and program
>     directives;
> (2) The inmate's compliance with the rules and policies of the
>     department;
> (3) Conduct by the inmate evincing an intent to reoffend; and
> (4)  Mitigating factors impacting the warden's determination of
>     substantive noncompliance.
> The Board may also use standards in subdivisions (1) to (3),
> inclusive, of this section in discretionary parole decisions.  In
> addition to considering a discretionary parole for an inmate who
> previously violated parole, the board may consider the nature and
> seriousness of the conduct leading to the parole revocation.

[12] The court notes that this case is distinguishable from cases alleging that the
disciplinary process resulted in stigmatizing the prisoner, by committing him to
a mental health hospital or branding him a "gang member."  See Vitek, 445
U.S. at 493-94; Horse v. Young, Civ. No. 14-4137 at Docket No. 11, p. 3.

could be called only when "permitting [Gard] to do so will not be unduly

hazardous to institutional safety or correctional goals."  Wolff, 418 U.S. at 566.

The Court noted that prison officials retain the necessary discretion to refuse to

allow a prisoner an unqualified right to call any and all witnesses.  Id. at 566-

67.  "The discretion of prison officials [to deny a prisoner's request to call

witnesses] is so broad that 'it may be that a constitutional challenge to a

disciplinary hearing [based upon an inmate's right to call witnesses] . . . will

rarely, if ever, be successful.' "  Hudson v. Hedgepeth, 92 F.3d 748, 752 (8th

Cir. 1996) (quoting Brown v. Frey, 889 F.2d 159, 167 (8th Cir. 1989) (quoting

Ponte v. Real, 471 U.S. 491, 499 (1985))).

    To that end, the South Dakota prison rules contemplate allowing

accused prisoners to call witnesses at disciplinary hearings--if they notify the

prison in advance of the hearing of the identity of the inmates they wish to call

as witnesses and state the relevance of their testimony.  See Docket No. 64-13

(SD DOC Policy 1.3.C.2 at ¶ B.1).  There are two very solid reasons for this

rule.  First, advance notice affords the inmate-witness an opportunity to

decline to testify.  Second, security and logistical concerns with moving

prisoners about can be better met if officials know in advance who will be

testifying at a disciplinary hearing.  Taking these concerns into consideration

in conditioning Mr. Gard's ability to call witnesses on his behalf is anticipated

and condoned by Wolff.  Wolff, 418 U.S. at 566-67.

    When Mr. Gard was offered the opportunity to fill out a form in advance

of his hearing to identify which witnesses he wished to call, he declined to fill

45

out the form.  See Docket No. 64-8.  Although no witnesses are listed on this form, the form bears Mr. Gard's signature.  Id.  Mr. Gard never submitted a kite asking to call any witnesses.

Having failed to request witnesses in writing in advance of the hearing, during the hearing itself, Mr. Gard indicated he wanted to call a witness or witnesses impromptu.  The prison officials, quite rightly, refused this invitation to chaos.  Mr. Gard's right to call witnesses at the hearing, even under Wolff, was not violated.  Furthermore, prison policy would also have allowed Mr. Gard to present written statements from witnesses in place of live testimony.  See Docket No. 64-13 (SD DOC Policy 1.3.C.2 at ¶ B.2).  If Mr. Gard had some reason for not wanting to give the prison advance notice of his witnesses before the hearing, he could have brought written witness statements to the hearing with him to present as evidence.  Id.

The Wolff Court also held that the right to confrontation and cross-examination does not necessarily extend to prison disciplinary proceedings.  To extend to an accused prisoner an unfettered right to confront and cross-examine his accusers would create "considerable potential for havoc inside the prison walls."  Wolff, 418 U.S. at 567.  As such, the Court held that "it does not appear that confrontation and cross-examination are generally required in this context."  Id. at 568.  Instead, whether to allow those rights in a prison disciplinary proceeding was left "to the sound discretion of the officials of state prisons."  Id. at 569.

46

Here, the identity of the confidential informant was not revealed to

Mr. Gard.  However, the circumstances leading the hearing examiner to find

the informant to be reliable *were* given in writing to Mr. Gard:

> Reliable [confidential informant] information was received that
> Inmate Gard set-up the [contraband] drop behind Ludeman Hall
> and hired Inmate #52464 to retrieve the contraband.  Camera
> footage has been reviewed & on the morning of 12-4-11 an outsider
> is observed throwing contraband over the security fences located
> behind Ludeman Hall.  A short time later Inmate #52464 is
> observed retrieving the contraband & passing in [sic] through the
> window of room 113.  Inmate Gard lives in room 113 & was in the
> room at the time of the incident.  The CI's [sic] reported the
> contraband was tobacco.

See Docket No. 64-9 at p. 2

Withholding the identity of the confidential informer from Mr. Gard

under these circumstances did not violate Mr. Gard's due process rights.

There was ample circumstantial and film evidence to corroborate the informer's

information.  The finding of reliability by the prison officials was eminently

reasonable.  Furthermore, Mr. Gard was on notice that confidential information

was relied upon by the hearing examiner.

Mr. Gard argues in his response in opposition to defendants' summary

judgment motion that the witness he wished to call at his disciplinary

proceeding *was* the confidential informant, who was known to Mr. Gard only

by his inmate number.  See Docket No. 79 at 1.  For the same reasons that

defendants had the discretion to refuse to disclose this inmate's identity to

Mr. Gard, as discussed above, defendants were well within the discretion

allowed by the constitution not to allow Mr. Gard to call this inmate as a

witness—to do so would have required prison officials to reveal the confidential

47

informant's identity to Mr. Gard.  The court has already determined, as discussed above, that defendants were not required to reveal this inmate's identity in order to comply with the dictates of due process.

In addition, the above recited paragraph was part of the written materials given to Mr. Gard to advise him of the charges against him.  When ruling after the hearing, defendants advised Mr. Gard that that paragraph (the "write-up"), along with informationals, and inmate testimony is what formed the basis for the finding that Mr. Gard did in fact arrange to smuggle contraband into the prison.  See Docket No. 64-9.  This satisfied the Wolff requirement that Mr. Gard be given a "meaningful explanation" of the finding of guilt.

Finally, Mr. Gard has now produced post hoc affidavits from two inmates allegedly establishing their guilt and Mr. Gard's innocence with regard to the contraband infraction.  See Docket No. 80-2.  The court views these late-breaking affidavits with some suspicion, but the law requires only that there be "some evidence" to support the prison's disciplinary findings.  Superintendent, 472 U.S. at 455.  Here, there clearly was "some evidence" supporting the finding that Mr. Gard smuggled contraband into the prison:  the security film footage, the information from the confidential informer, and the discovery of contraband tobacco in Room 113 once Mr. Gard and his cellmates were removed.  "The fact that [Mr. Gard] may have been innocent of the charges does not raise a due process issue."  Ricker v. Leapley, 25 F.3d 1406, 1410 (8th Cir. 1994).  "The Constitutional demands due process, not error-free decision-making."  Id. (citation omitted).  This court recommends that defendants be

48

granted summary judgment on the issue of qualified immunity on Mr. Gard's due process claims.  Mr. Gard has not shown that defendants were "plainly incompetent" regarding his due process rights in the prison disciplinary proceedings.

### 6.    Mr. Gard's Personal Property

When Mr. Gard was placed in the SHU and again when he was moved from the Springfield prison to the Sioux Falls prison, he alleges that prison officials confiscated his property from his room at Springfield and either intentionally destroyed or disposed of it or that they negligently did so or allowed others to do so.  The Supreme Court in Parratt v. Taylor, 451 U.S. 527, 539-41 (1981), overruled in part by Daniels v. Williams, 474 U.S. 327 (1986)[13], established that prison officials cannot be held liable for negligent deprivation of property under the Fourteenth Amendment if there is an adequate postdeprivation state remedy.  In Hudson v. Palmer, 468 U.S. 517, 533 (1984), the Court extended the Parratt rule to intentional deprivations of property—if there is an adequate postdeprivation remedy, then there is no due process violation for the intentional deprivation of a prisoner's property.  Because state law provided the prisoner in Hudson with adequate state remedies after the deprivation of his property, the Court held that no due process violation occurred in that case.  Id. at 535.

---

[13] In Daniels, the Supreme Court clarified that "the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty or property."  Daniels, 474 U.S. at 328 (emphasis in original).

Here, defendants argue that SDCL § 21-3-3 provides an adequate

postdeprivation remedy.  That statute provides as follows:

> The detriment caused by the wrongful conversion of personal
> property is presumed to be:
>     (1) the value of the property at the time of the conversion,
> with interest from that time;
>     (2) where the action has been prosecuted with reasonable
> diligence, the highest market value of the property at any time
> between the conversion and the verdict, without interest, at the
> option of the injured party;
>     (3) a fair compensation for the time and money property
> expended in pursuit of the property.
> Such presumptions cannot be repelled in favor of one whose
> possession was wrongful from the beginning by his subsequent
> application of the property to the benefit of the owner, without his
> consent.

See SDCL § 21-3-3.

Section 21-3-3 provides a description of the damages available for

conversion, but the tort of conversion is a common law tort not defined in the

statute.  Rensch v. Riddle's Diamonds of Rapid City, Inc., 393 N.W.2d 269, 271

(S.D. 1986).  Conversion "rests upon the unwarranted interference by

defendant with the dominion over the property of the plaintiff from which

injury to the latter results."  See Fin-Ag., Inc. v. Pipestone Livestock Auction

Market, Inc., 2008 S.D. 48, ¶ 41, 754 N.W.2d 29, 46.  "Conversion is the

unauthorized exercise of control or dominion over personal property in a way

that repudiates an owner's right in the property or in a manner inconsistent

with such right."  Chem-Age Indus., Inc. v. Glover, 2002 S.D. 122, ¶ 20, 652

N.W.2d 756, 766.  "Intent or purpose to do a wrong is not a necessary element

of proof to establish conversion."  Id. (quoting Rensch, 393 N.W.2d at 271).

50

The common law and SDCL § 21-3-3 provide Mr. Gard with an adequate postdeprivation remedy for the conversion of his property.  Accordingly, there is no due process violation.  <u>Hudson</u>, 468 U.S. at 535.  The court therefore recommends granting defendants' motion for summary judgment on Mr. Gard's property deprivation claim.  Mr. Gard has not shown the defendants were "plainly incompetent" as to his due process property interests.

## CONCLUSION

This court respectfully recommends that defendants' motion for summary judgment [Docket No. 63] be granted in its entirety and that each of Mr. Gard's claims be dismissed with prejudice.

This court also respectfully recommends that plaintiff Rex Gard's motion for partial summary judgment as to liability on his due process, access to the courts, and excessive fines claims [Docket No. 38] be denied in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED this 30th day of January, 2015.

BY THE COURT:

_Veronica L. Duffy_

_____
VERONICA L. DUFFY
United States Magistrate Judge

51